Slip Op. 18-171

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOLARWORLD AMERICAS, INC. ET AL.,** | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| **and** | |
| **CANADIAN SOLAR INC. ET AL.,** | |
| **Plaintiff-Intervenors and Consolidated Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 16-00134** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD. ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenor.** | |

## OPINION

[Sustaining the U.S. Department of Commerce's second remand redetermination in the second antidumping duty administrative review of crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: December 13, 2018

Timothy C. Brightbill, Wiley Rein, LLP, of Washington, DC, argued for SolarWorld Americas, Inc.  With him on the brief were Laura El-Sabaawi and Usha Neelakantan.

Robert George Gosselink, Trade Pacific, PLLC, of Washington, DC, argued for Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science & Technology Co., Ltd.; Trina Solar (U.S.) Inc.; Yancheng Trina Solar Energy Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.; and Hubei Trina Solar Energy Co., Ltd.  With him on the brief was Jonathan Michael Freed.

Neil R. Ellis, Sidley Austin, LLP, of Washington, DC, argued for Yingli Green Energy Holding Co., Ltd.; Yingli Green Energy Americas, Inc.; Yingli Energy (China) Co., Ltd.; Baoding Tianwei Yingli New Energy Resources Co., Ltd.; Beijing Tianneng Yingli New Energy Resources Co., Ltd.; Tianjin Yingli New Energy Resources Co., Ltd.; Hengshui Yingli New Energy Resources Co., Ltd.; Lixian Yingli New Energy Resources Co., Ltd.; Baoding Jiasheng Photovoltaic Technology Co., Ltd.; Hainan Yingli New Energy Resources Co., Ltd.; and Shenzhen Yingli New Energy Resources Co., Ltd.  With him on the brief were Richard L.A. Weiner, Shawn Michael Higgins, and Justin Ross Becker.

Neil R. Ellis, Richard L.A. Weiner, Shawn Michael Higgins, and Justin Ross Becker, Sidley Austin, LLP, of Washington, DC, for Canadian Solar Inc.; Canadian Solar (USA) Inc.; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; and Canadian Solar International Limited.

Craig Anderson Lewis, Hogan Lovells US LLP, of Washington, DC, for BYD (Shangluo) Industrial Co., Ltd. and Shanghai BYD Co., Ltd.

Tara Kathleen Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, and Jeanne E. Davidson, Director. Of Counsel on the brief was Mercedes C. Morno, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge:   Before the court is the U.S. Department of Commerce's ("Commerce" or "Department") second remand redetermination in the second administrative review of the antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("China" or "the PRC").  See Results of Second Remand Redetermination Pursuant to Court Order, July 31, 2018, ECF No. 144-1 ("Second Remand Results"); see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the

[PRC], 81 Fed. Reg. 39,905 (Dep't Commerce June 20, 2016) (final results of ADD administrative review and final determination of no shipments; 2013–2014) and accompanying Decision Mem. for the Final Results of the 2013–2014 [ADD] Admin. Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the [PRC], A-570-979, (June 13, 2016), ECF No. 21-5 ("Final Decision Memo").[1]  In SolarWorld Americas, Inc. v. United States, 42 CIT __, 320 F. Supp. 3d 1341 (2018) ("SolarWorld Americas II"), the court remanded for reconsideration or further explanation Commerce's surrogate value selection for mandatory respondent Yingli Green Energy Holding Co., Ltd.'s ("Yingli") tempered glass input and Changzhou Trina Solar Energy Co., Ltd.'s ("Trina") scrapped solar cells and modules byproduct offset.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1358.  For the reasons that follow, the court sustains Commerce's Second Remand Results in full.

## BACKGROUND

The court assumes familiarity with the facts as set forth in the previous opinions and recounts the facts relevant to the issues currently before the court.  See SolarWorld Americas, Inc. v. United States, 41 CIT __, __, 273 F. Supp. 3d 1254, 1259–61 (2017) ("SolarWorld Americas I"); SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1345–48.  In the second administrative review[2] of the ADD order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from China, Commerce

---

[1] The Final Decision Memo is also referred to throughout as the "final determination."

[2] Each year during the anniversary month of the publication of an ADD duty order, interested parties may request that Commerce conduct an administrative review of that order.  See 19 C.F.R. § 351.213; see also 19 U.S.C. § 1677 (for definition of interested parties).

selected Yingli and Trina as mandatory respondents.  See Crystalline Silicon Photovoltaic

Cells, Whether or Not Assembled Into Modules, From the [PRC], 80 Fed. Reg. 80,746,

80,746 (Dep't Commerce Dec. 28, 2015) (preliminary results of ADD administrative

review and preliminary determination of no shipments; 2013–2014) and accompanying

Decision Mem. for Prelim. Results of the 2013–2014 [ADD] Administrative Review of

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the

[PRC] at 2, A-570-979, PD 520, bar code 3427351-01 (Dec. 18, 2015) (citing 2013–2014

[ADD] Admin. Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled

into Modules, from the [PRC]: Respondent Selection at 4–5, A-570-979, PD 67, bar code

3264380-01 (Mar. 13, 2015)).[3]   In the final determination, Commerce valued Yingli's

tempered glass input using Thai import data under Harmonized Tariff Schedule ("HTS")

subheading 7007.19.9000, see Final Decision Memo at 29–34, and Trina's scrapped

solar cell and module byproduct using Thai import data under HTS subheading 8548.10.[4]

See id. at 46–48.

---

[3] On September 14, 2016, Defendant submitted indices to the public and confidential administrative records for this review.  These indices are located on the docket at ECF Nos. 21-2 and 21-3.  All further references to documents from the administrative records are identified by the numbers assigned by Commerce in these indices.

[4] In the final determination, Commerce valued Yingli's, but not Trina's, scrapped solar cells using Thai import values for HTS 2804.69, explaining:

> Yingli reported that it removes the polysilicon from its scrap solar cells and reintroduces it into production. Thus, the value of these scrap solar cells is in the silicon content. Hence, consistent with Solar ARI, we valued Yingli's scrap cells based on HTS 2804.69, which is the HTS category applicable to silicon.

Final Decision Memo at 47.  Commerce noted that, "[i]n contrast," because Trina reported that its scrap is composed of broken cells and modules that could not be reintroduced into production, the agency "determined that Trina's cell scrap consisted of every component of the cell, not simply polysilicon, and its modules scrap consisted of every component of the module."  Id.

Plaintiff, SolarWorld Americas, Inc. ("SolarWorld"), commenced litigation in this court, moving for judgment on the agency record. See Summons, July 20, 2016, ECF No. 1 (commencing this action pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012));[5] Compl., Aug. 19, 2016, ECF No. 10. SolarWorld challenged, inter alia, Commerce's decision to value Trina's scrapped solar cell and module byproduct using, as best information available, Thai data for imports classified under HTS subheading 8548.10 rather than import data under Thai HTS 2804.69.[6] See Compl. at ¶ 22, Aug. 19, 2016, ECF No. 10.

Mandatory respondent Yingli et al.[7] also commenced litigation before this court challenging various aspects of Commerce's final determination, and the case was consolidated with the present action. See Summons, July 20, 2016, ECF No. 1 (Court. No. 16-00135); Amended Summons, Aug. 10, 2016, ECF No. 12 (Court. No. 16-00135); Compl., Aug. 19, 2016, ECF No. 13 (Court. No. 16-00135); Order, Oct. 25, 2016, ECF No. 31 (consolidating Court No. 16-00132, Court. No. 16-00134, and Court No. 16-00135

---

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[6] Thai HTS 8548.10 covers "Waste and scrap of primary cells, primary batteries and electric accumulators; spent primary cells, spent primary batteries and spent electric accumulators; electrical parts of machinery or apparatus, not specified or included elsewhere in this Chapter: Other," whereas Thai HTS 2804.69 covers silicon containing less than 99.99% purity. See Final Decision Memo at 46–47.

[7] The following parties are plaintiffs in the action Yingli Green Energy Holding Co., Ltd. v. United States, Ct. No. 16-00135, which has been consolidated with the present action: Yingli Green Energy Holding Company Limited; Yingli Green Energy Americas, Inc.; Yingli Energy (China) Co., Ltd.; Baoding Tianwei Yingli New Energy Resources Co., Ltd.; Tianjin Yingli New Energy Resources Co., Ltd.; Hengshui Yingli New Energy Resources Co., Ltd.; Lixian Yingli New Energy Resources Co., Ltd.; Baoding Jiasheng Photovoltaic Technology Co., Ltd.; Beijing Tianneng Yingli New Energy Resources Co., Ltd.; Hainan Yingli New Energy Resources Co., Ltd.; and Shenzhen Yingli New Energy Resources Co., Ltd.

under Court No. 16-00134).[8]  Yingli challenged, inter alia, Commerce's decision to use, as best information available, import data under Thai HTS 7007.19.9000 to value Yingli's tempered glass input, contending that the data is aberrational.  See Mem. Points and Authorities Supp. Mot. J. Agency R. at 9–26, Jan. 26, 2017, ECF No. 42.

In SolarWorld Americas I, the court remanded for further explanation or reconsideration Commerce's selection of a surrogate value for Yingli's tempered glass input to explain why its selection is reasonable in light of (1) evidence that the Hong Kong input data has a disproportionate impact on the Thai surrogate value, and (2) Yingli's allegation that Commerce used unreliable benchmarks in determining whether the Thai data was aberrational.[9]  See SolarWorld Americas I, 41 CIT at __, 273 F. Supp. 3d at 1263–65, 1278–79.   Additionally, the court remanded for further explanation or reconsideration Commerce's decision to value Trina's scrapped solar cells and modules byproduct offset using, as best information available, import data for Thai HTS category 8548.10.  See id., 41 CIT at __, 273 F. Supp. 3d at 1268, 1278–79.  The court found that Commerce had not sufficiently explained why its selection was reasonable given that HTS 8548.10 is not specific to the solar cells and modules, and in light of the fact that the selection resulted in a surrogate value for a byproduct that is higher than the value of the input itself.  See id.

---

[8] The issues raised in Court No. 16-00132 are not relevant to this remand.  See Compl., Aug. 17, 2016, ECF No. 10 (Court No. 16-00132).

[9] Yingli argued that Commerce unreasonably used data from Ecuador and Ukraine as benchmarks, and such data were not credible because these countries' imports of tempered glass were low in quantity relative to the imports from other economically comparable countries and to the quantity of tempered glass purchased by Yingli.  See Mem. Points and Authorities Supp. Mot. J. Agency R. at 15–16, Jan. 26, 2017, ECF No. 42.

Commerce filed the first remand results on January 18, 2018. See Final Results of Remand Redetermination, Jan. 18, 2018, ECF No. 123-1 ("First Remand Results"). There, Commerce continued to use Thai import data to value Yingli's tempered glass inputs, again determining that the import data is not aberrational based on a revised explanation of its practice for determining aberration. See id. at 1–2, 12–32. Commerce also continued to value Trina's scrapped solar cells and modules under Thai HTS category 8548.10, providing additional explanation for why its surrogate value selection is appropriate, and explaining that the proper value comparison is the scrap surrogate value to the cost of solar cells and modules, rather than the cost of polysilicon alone. See id. at 1, 53–64.

The court again remanded for further explanation or reconsideration Commerce's surrogate value selections for Yingli's tempered glass input and Trina's scrapped solar cells and modules byproduct offset. See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1345, 1358. With respect to Yingli's tempered glass input, the court instructed Commerce to explain whether its practice is to assess what percentage of the market the allegedly aberrational input data constitutes to determine whether that data is representative of the market, and if it is, to clarify how its practice is relevant here, where the allegedly aberrational Hong Kong data comprises just 1.6% of the overall import data into Thailand, and constitutes more than 75% of the overall value of the Thai import data. See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1353–55. The court instructed that if Commerce does not have a practice of considering what percentage of market share is made up by the input data in question, then Commerce should explain

why it focused on market representation in Multilayered Wood Flooring from [the PRC].

SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1353; see also Multilayered

Wood Flooring from [the PRC], 80 Fed. Reg. 41,476 (Dep't Commerce July 15, 2015)

(final results of [ADD] administrative review and final results of new shipper review; 2012–

2013) and accompanying Issues and Decision Mem. for the Final Results of the 2012–

2013 [ADD] Admin. Review of Multilayered Wood Flooring from [the PRC] at Comment

11.D,        A-570-970,        (July        8,        2015),        available        at

https://enforcement.trade.gov/frn/summary/prc/2015-17368-1.pdf (last visited Dec. 10,

2018) ("Wood Flooring").   The court noted that Commerce invoked Wood Flooring in its

First Remand Results, and thus the agency needed to clarify its practice and why, in light

of that practice, its selection of the Thai import data constitutes a reasonable surrogate

value for the tempered glass input.  SolarWorld Americas II, 42 CIT at __, 320 F. Supp.

3d at 1353–54.  Additionally, the court instructed Commerce to explain why its selection

of the Thai import data as a surrogate value is reasonable in this case, given the evidence

showing the Hong Kong data's disproportionate impact on the overall value of the Thai

import data.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1354–55.  The

court explained that by including the Hong Kong data, which has a disproportionate effect

on the overall Thai import value, Commerce appears to contradict its preference for

selecting surrogate values based on broad data that reflect the surrogate country's market

as a whole.  Id. (quoting First Remand Results at 15).[10]

---

[10] With respect to Commerce's argument that assessing individual inputs for aberration would

(footnote continued)

With respect to Commerce's selection of Thai HTS category 8548.10 to value Trina's scrapped solar cell and module byproduct, the court held that Commerce failed to adequately explain why it chose HTS category 8548.10 rather than HTS category 2804.69.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1356–58.  The court explained that "[p]roducts that are assembled from multiple inputs, convey electricity, undergo certain unspecified manufacturing processes, and are ultimately scrapped do not inherently share a similar value."  Id., 42 CIT at __, 320 F. Supp. 3d at 1356.  Further, the court explained that the goal of adopting a surrogate value should be to find a product that is similarly valued in order to achieve an accurate valuation for the respondent's byproduct, and, ultimately, for the respondent's normal value.  Id., 42 CIT at __, 320 F. Supp. 3d at 1356.  Accordingly, the court held, Commerce had not provided an explanation regarding why the selection of a category covering scrapped electrical batteries accurately values Trina's scrapped solar cells and modules byproduct.  Id., 42 CIT at __, 320 F. Supp. 3d at 1357–58.

Commerce submitted the Second Remand Results on July 31, 2018.  See Second Remand Results.  With respect to the decision to value Yingli's tempered glass inputs using Thai import data, Commerce determined, under protest,[11] to instead value Yingli's tempered glass using Bulgarian import data.  See Second Remand Results at 14, 19–20.

---

impose a heavy administrative burden, the court noted that although this is a significant concern, it does not outweigh the accuracy concerns raised in this case where the data has such a disproportionate effect.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1355.

[11] By adopting a position "under protest," Commerce preserved its right to appeal; the Court of Appeals has held that Commerce preserves its right to appeal in instances where Commerce makes a determination under protest and the Court of International Trade sustains its decision after remand.  See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

Commerce noted that the record contains contemporaneous import data for tempered glass from three countries, but Commerce selected that of Bulgaria because it was the country with the largest volume of tempered glass to value the input.  Id. at 18–19.

As for Commerce's decision to value Trina's scrapped solar modules using Thai HTS 8548.10, Commerce, under protest, reconsidered its selection and decided instead to use Thai HTS 2804.69 to value Trina's scrap solar cells and modules.  Second Remand Results at 8, 11, 14.  Commerce explained that there are two potential values to use as best available information for scrap solar cells and modules on the record: Thai HTS 8548.10, which covers "waste and scrap of primary cells, primary batteries and accumulators; spent primary cells, spent primary batteries, and spent electrical accumulators," and Thai HTS 2804.69, which covers silicon of less than 99.9 percent purity.  Second Remand Results at 9.[12]  In the Second Remand Results, Commerce chose to use the latter.  Id. at 8, 11, 14.

---

[12] Commerce noted that its previous decision to value scrapped solar modules using Thai HTS 8548.10 relied on the fact that both items are engineered products that include metal components and chemicals.  Id. at 9.  Further, Commerce viewed the battery and solar cell or module, components as similar in nature, noting that both were used in an engineered product designed to generate electricity.  Id.  Additionally, Commerce noted its reasons for its previous decision: Thai HTS 8548.10 covers scrap materials, Thai HTS 2804.69 covers a less pure form of silicon than the polysilicon used in solar cells, and Trina's solar cells and modules contain more components than polysilicon alone.  Id. at 9–10.  Nonetheless, pursuant to the court's previous findings regarding Commerce's reasoning, Commerce decided, under protest, to value Trina's scrap solar cells and modules using Thai HTS 2804.69.  Id. at 11.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

**DISCUSSION**

**I.  Tempered Glass**

In this second administrative review, Yingli reported tempered glass as a factor of production ("FOP").  See Final Decision Memo at 29; Decision Memorandum for Preliminary Results of the 2013–2014 [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, From the [PRC] at 30, A-570-979, (Dec. 18, 2015), available at https://enforcement.trade.gov/frn/summary/prc/2015-32630-1.pdf (last visited Dec. 10, 2018) ("Preliminary Decision Memo").  Commerce, in the Second Remand Results, used Bulgarian import data to value Yingli's tempered glass.  See Second Remand Results at

14, 18–19, 20–21.  For the reasons that follow, Commerce's decision to use Bulgarian import data to value Yingli's tempered glass is supported by substantial evidence.

When Commerce conducts an ADD investigation or an administrative review of an ADD order, it must determine whether subject merchandise is being, or is likely to be, sold at less than fair value.  See 19 U.S.C. § 1677b.  The statute provides that in determining whether merchandise is being sold at less than fair value, "a fair comparison shall be made between the export price or constructed export price and normal value." Id.  Commerce, in administering the antidumping statute, must determine what constitutes "normal value," i.e., the price at which the product is sold or offered for sale in the exporting country.  See 19 U.S.C. § 1677b(a)(1)(B).  Where the producer or exporter in question is from a nonmarket economy ("NME") country, such as China, and Commerce finds that available information does not permit an accurate determination of the merchandise's normal value, Commerce must determine normal value based on the FOPs utilized to produce the merchandise.[13]  See 19 U.S.C. § 1677b(c); see also Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, Vol. 1, at 808–809.  Pursuant to 19 U.S.C. § 1677b(c)(1)(B), Commerce determines the value of the FOPs "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate" by Commerce.  Commerce utilizes, to the extent possible, prices from one or more market economy countries that are at a level of economic development

---

[13] In addition to FOPs, Commerce must also include "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1)(B).

comparable to that of the NME country and that are significant producers of comparable merchandise.  See 19 U.S.C. § 1677b(c)(4).  Where multiple market economy countries satisfy these two criteria, Commerce's methodology for selecting the best source is to choose a price that is (1) specific to the input; (2) tax and import duty exclusive; (3) contemporaneous with the period of review; (4) representative of a broad market average; and (5) publically available.  See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Dec 10, 2018) ("Policy Bulletin 04.1").  Although Commerce has broad discretion in deciding what constitutes the best available information, see QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (noting the absence of a definition for "best available information" in the ADD statute), Commerce must ground its determination in the objective of the ADD statute: to calculate accurate dumping margins.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); see also Parkdale Int'l. v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).  Commerce then adds the value of the FOPs of the merchandise, along with value for other costs, expenses, and profits to determine normal value.  See 19 U.S.C. § 1677b(c)(1).

As explained in SolarWorld Americas I and SolarWorld Americas II, Commerce's practice is to avoid using aberrational values as surrogate values.  See generally Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997); see also Certain Activated Carbon From the [PRC], 80 Fed. Reg. 61,172 (Dep't Commerce Oct. 9, 2015) (final results of [ADD] administrative review;

2013–2014) and accompanying Certain Activated Carbon from the [PRC]: Issues and

Decision Memorandum for the Final Results of the Seventh [ADD] Administrative Review

at     26,     A-570-904,     (Oct.     2,     2015),     <u>available     at</u>

https://enforcement.trade.gov/frn/summary/prc/2015-25810-1.pdf (last visited Dec 10,

2018).    It is the agency's practice, "[w]hen presented with sufficient evidence to

demonstrate that a particular surrogate value is aberrational, and therefore unreliable," to

"examine relevant price information on the record, including any appropriate benchmark

data, in order to accurately value the input in question."  <u>First Remand Results</u> at 6.

Commerce considers whether import data is aberrational if it is "many times higher than

the import values from other countries." Final Decision Memo at 33.  Commerce's method

for determining whether a surrogate value is aberrational is to examine the HTS data both

across potential surrogate countries in a given case, as well as within the surrogate

country over multiple years.  <u>First Remand Results</u> at 6.

    In the <u>Second Remand Results</u>, pursuant to the court's holding in <u>SolarWorld</u>

<u>Americas II</u>, Commerce reconsidered its decision to value Yingli's tempered glass inputs

using Thai import data, instead opting to use Bulgarian import data.  <u>Second Remand</u>

<u>Results</u> at 14, 19–20.  Commerce has complied with the court's order in <u>SolarWorld</u>

<u>Americas II</u>.  The Bulgarian import data, along with import data for tempered glass from

Ecuador and Ukraine, meet the requirements for best available information for the

reasons set out by Commerce.  <u>See</u> <u>Second Remand Results</u> at 18.  Specifically, the

data is specific to the input, tax and duty exclusive, contemporaneous, representative of

a broad market average, and publically available.  <u>Id.</u>  Further, by using the Bulgarian

import data, Commerce avoids the data-quality concerns described by the court in

SolarWorld Americas II regarding the Thai import data, and thus complies with the court's

order.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1354–55.  With

respect to why Commerce selected Bulgarian data from the available choices, Commerce

adhered to its practice of prioritizing the data source with the highest import volume of the

subject merchandise.[14]  Second Remand Results at 18.  Here, the volume of tempered

glass imported into Bulgaria is greater than that of the other two potential surrogate

countries.  Id. at 19.

SolarWorld argues that Commerce's decision to change its selection of a surrogate

value from the Thai data to the Bulgarian data is unreasonable and inconsistent with the

agency's practice because Commerce's practice is to examine the surrogate country's

AUV in the aggregate.[15]  Pl. [SolarWorld's] Comments on Final Results of Second

Redetermination Pursuant to Ct. Order at 5, Aug. 29, 2018, ECF No. 146 ("SolarWorld

Comments").  The court addressed this argument in SolarWorld Americas II.  See

SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1353–54.  Specifically,

SolarWorld argues—and Commerce maintains—that Commerce's practice is no longer

---

[14] Commerce cites several recent examples of determinations in which Commerce had different surrogate countries from which to choose and selected the country with the highest volume of imports to value the input.  Id. at 18 (citing Chlorinated Isocyanurates from the [PRC], 81 Fed. Reg. 1167 (Dep't Commerce Jan. 11, 2016) (final results of [ADD] administrative review; 2013–2014); Chlorinated Isocyanurates from the [PRC], 80 Fed. Reg. 4,539 (Dep't Commerce Jan. 28, 2015) (final results of [ADD] administrative review; 2012–2013); Certain Activated Carbon from the [PRC], 82 Fed. Reg. 51,607 (Dep't Commerce Nov. 7, 2017) (final results of [ADD] administrative review; 2015–2016; Certain Activated Carbon from the [PRC], 81 Fed. Reg. 62,088 (Dep't Commerce Sept. 8, 2016) (final results of [ADD] administrative review; 2014–2015).

[15] Commerce makes the same argument in its Second Remand Results, but ultimately chooses, under protest, to use the Bulgarian import data to value Yingli's tempered glass in order to comply with the court's opinion in SolarWorld Americas II.  See Second Remand Results at 17, 20.

to examine whether imports from a particular country that are used to calculate an AUV are distortive, but to determine whether the surrogate country's AUV for the subject FOP, in the aggregate, is aberrational.  SolarWorld Comments at 5; Second Remand Results at 20.  Commerce cites Wood Flooring as evidence of this practice, see Second Remand Results at 20; yet, as noted in SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1353, Commerce explained in Wood Flooring why the allegedly aberrational inputs were in fact representative of market-driven prices by describing the share each input represented of the aggregate data.  See Wood Flooring at 43 (finding that "imports from Taiwan and the United States represent the vast majority of imports into Thailand (77.1%) and, therefore, are a true representation of market-driven prices.").  Commerce's analysis in Wood Flooring thus belies the notion that Commerce never assesses the individual inputs that make up the aggregate data for a surrogate source.[16]

Additionally, as explained in SolarWorld Americas II, even if Commerce's practice is to only consider whether the AUV in the aggregate is aberrational, Commerce has failed to explain how such a practice is reasonable here.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1354–55.  Commerce asserts that its current practice aims to use broad, market average prices in furtherance of its statutory obligation to rely on the

---

[16] Despite selecting Bulgarian data in the Second Remand Results, Commerce continues to defend its original determination to use Thai import data to value Yingli's tempered glass inputs. See Second Remand Results at 14–17, 20. Commerce now attempts to explain away the Wood Flooring inconsistency, asserting that this "additional analysis" was simply to "identify the flaw in the petitioner's argument." Second Remand Results at 20. This explanation is unavailing, given the plain phrasing used by Commerce in Wood Flooring. See Wood Flooring at 43. Despite announcing that Commerce's practice is only to examine surrogate value data in the aggregate, Commerce analyzed individual inputs to the aggregate surrogate data source to demonstrate that the data inputs still represented market-driven prices. See id.

best information available.  See Second Remand Results at 17.  Yet, Commerce would choose to use Thai data that includes unit values from Hong Kong comprising only 1.6% of the import volume but contributing value nearly two-hundred times higher than the average unit values from the rest of the import data.  See Yingli's July 29, 2015 Surrogate Values Rebuttal Comments at SVR-3, Aug. 11, 2017, ECF No. 90-29.  A general practice that considers values in the aggregate to avoid administrative burden may be reasonable, see SolarWorld Americas II at 21, but where the chosen AUV contains data inputs as far afield as described here, Commerce must explain why continued use of such data is reasonable.  Without additional explanation, Commerce cannot reasonably state that the use of such data furthers its aim of adopting broad, market-average prices to calculate accurate dumping margins.  See Second Remand Results at 16.  Accordingly, SolarWorld's argument fails.

## II. Scrapped Solar Cells and Modules

In this second administrative review, Trina reported generating cell and module scrap in the cell and module production stages of production.  See Trina Section D Questionnaire and Appendices Response at D-22–23, CD 153–161, bar codes 3276429-01–10 (May 14, 2015).  Trina reported that the broken cells and modules are sold rather than reintroduced into production, and accordingly claimed by-product offsets to normal value for the scrapped cells and modules.  Id. at D-22.  In the Second Remand Results, Commerce valued Trina's cell and module scrap using Thai HTS 2804.69, which covers silicon of a purity less than 99.99 percent.  See Second Remand Results at 8, 14.  For the reasons that follow, Commerce's determination is supported by substantial evidence.

As described above, Commerce determines the value of the FOPs "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate" by Commerce.   19 U.S.C. § 1677b(c)(1)(B).   Commerce has discretion in deciding what constitutes the best available information, see QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011), but it must ground its determination in the statutory objective of calculating accurate dumping margins.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); see also Parkdale Int'l. v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).  The source should be, to the extent possible, a market economy country at a similar level of economic development as the NME country, and a significant producer of comparable merchandise.   See 19 U.S.C. § 1677b(c)(4).   In selecting from multiple potential sources, Commerce selects a source that is (1) specific to the input; (2) tax and import duty exclusive; (3) contemporaneous with the period of review; (4) representative of a broad market average; and (5) publically available.  See Policy Bulletin 04.1.

Here, Commerce opted in its Second Remand Results to value Trina's scrap cells and modules using import data under Thai HTS 2804.69.  See Second Remand Results at 8, 14.  As Commerce observed, the record contains only two potential sources of data for valuing Trina's scrap solar cells and modules: Thai HTS 8548.10 and Thai HTS 2804.69.  Id. at 9, 14.  Commerce's decision to use Thai HTS 2804.69 responds to the court's order in SolarWorld Americas II, and is supported by substantial evidence.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1358.

Trina argues that Commerce's decision to use Thai HTS 2804.69 rather than Thai HTS 8548.10 in its <u>Second Remand Results</u> is unsupported by substantial evidence because the record supports the conclusion that Trina's scrapped solar modules are sold for value and uses other than their polysilicon content.  Consol. Pl. Trina's Comment on [Commerce's] Final Results of Second Redetermination Pursuant to Remand at 3, Aug. 30, 2018, ECF No. 150 ("Trina's Comments").  Trina cites evidence from the record indicating that Trina's module scrap offset is sold to third parties where modules do not meet the required specifications but are still capable of generating some electricity through solar energy.  Trina's Comments at 3–4 (citing Trina Supplemental Questionnaire Response at Section C&D-21, A-570-979, PD 269, bar code 328747-01 (June 30, 2015)).  Consequently, Trina argues, the record supports the notion that the value of Trina's sales of scrap cells and modules was based on factors other than polysilicon content, making it unreasonable for Commerce to use Thai HTS 2804.69.  <u>See</u> Trina's Comments at 4.  This argument fails, given that it is merely a defense of Commerce's prior determination, which this court held was unsupported by substantial evidence in <u>SolarWorld Americas II</u>, 42 CIT at __, 320 F. Supp. 3d at 1356–58.  Further, the record evidence referenced by Trina simply shows that third parties purchased Trina's scrap modules; it does not establish that they purchased scrap modules for purposes other than the polysilicon content.  This evidence does not, therefore, detract from Commerce's determination in its <u>Second Remand Results</u>.[17]

---

[17] Trina asserts that the record evidence showing that Trina's scrap modules are still capable of

(footnote continued)

Finally, Trina argues that the court's holding in SolarWorld Americas II with respect to Commerce's selection of Thai HTS 8548.10 "imposes a higher standard for assigning surrogate value for by-products than for valuing [FOPs]." Trina's Comments at 5.  Trina maintains that Commerce, in its final determination and First Remand Results, selected a surrogate value that most specifically described or captured the item being valued, and that this determination was not sufficiently rebutted by any interested party to this proceeding.  Id. at 5.  This argument fails because, again, Trina does not take issue with Commerce's determination in its Second Remand Results, but rather offers a defense of the position the court already remanded in SolarWorld Americas II.  The argument entirely ignores the court's observation in SolarWorld Americas II that the surrogate value should be a product that is similarly valued in order to achieve an accurate valuation for the respondent's byproduct and, ultimately, for the respondent's normal value.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1356.  Indeed, as the court explained, Commerce failed to adequately explain why its selection of a category covering scrapped electrical batteries accurately values the respondent's scrapped solar cells and

---

producing electricity through solar energy was not specifically raised previously, and therefore "may not have been clearly presented to the court." Trina's Comments at 4.  Commerce made this observation in the First Remand Results, see First Remand Results at 61, and therefore the argument is not new.  In the First Remand Results, Commerce, based on this fact and other information, reasoned that "[b]ecause solar cells and modules are electrical products manufactured using a multiple array of inputs, including chemicals and metals, we find that the potential surrogate covering scrapped manufactured electrical products comprising various inputs is the better surrogate compared to a potential surrogate covering silicon rocks." First Remand Results at 62.  The court remanded Commerce's First Remand Results based on its finding that Commerce failed to adequately explain why Thai HTS 8548.10 "provides a representative value for the scrapped solar cells and modules." See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1358.  The court thus ruled previously on Commerce's reasoning, which encompassed the fact Trina raises here.

modules byproduct.  See SolarWorld Americas II, 42 CIT at __, 320 F. Supp. 3d at 1356–57.  Accordingly, Trina's argument misses the mark, and Commerce's determination in its Second Remand Results adequately responds to the court's order.

## CONCLUSION

For the foregoing reasons, the Second Remand Results comply with the court's order in SolarWorld Americas II, are in accordance with law and supported by substantial evidence, and are therefore sustained.  Judgment will enter accordingly.


                                                  /s/ Claire R. Kelly
                                                 Claire R. Kelly, Judge

Dated:  December 13, 2018
           New York, New York